## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRANDON POPE** | ) |
| **2440 Astron Drive** | ) |
| **Colorado Springs, CO, 80906** | )   **Civil Action No.** |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) |
| | )   **JURY DEMAND INCLUDED** |
| **THE OFFICE OF DOUG LAMBORN,** | ) |
| **U.S. HOUSE OF** | ) |
| **REPRESENTATIVES, COLORADO,** | ) |
| **5TH DISTRICT,** | ) |
| **Rayburn House Office Building, 2371** | ) |
| **Washington, D.C. 20515** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## COMPLAINT

Plaintiff, Brandon Pope, by and through his undersigned counsel, hereby states his Complaint against Defendant, The Office of Doug Lamborn, U.S. House Of Representatives, Colorado, 5th District.  The following statements are made upon information and belief and may assert claims that are stated in the alternative.

In summary, Representative Lamborn had a reckless and dangerous approach to COVID-19, and he retaliated against Mr. Pope for seeking to protect employees from unsafe conditions in the workplace.  In the workplace, Lamborn did not require employees in the District Office to wear masks, claiming that he would not allow House Leadership to dictate how he ran his office, and he did not permit all employees to social distance.  Worse, when Lamborn and other senior members of his staff became infected with COVID-19 in the fall of 2020, Lamborn refused to implement or follow reasonable and responsible COVID-19 protocols, resulting in the widespread transmission of the virus throughout both the District and Washington, D.C. Offices.  Indeed, even

after he knew that he had been in close contact with his Deputy Chief of Staff, who had been infected, Lamborn told one staffer that he "did not care" if his employees got infected and that he was not going to wear a mask or isolate himself.  Lamborn did not advise employees who had been in close contact with infected persons in the workplace (including employees who were in close contact with him after he knew he was infected) that they may have been infected.

In early October 2020, after several employees of the D.C. office tested positive for COVID-19, Representative Lamborn closed the DC Office temporarily and instructed all D.C. employees to work from home, while the District Office in Colorado Springs would cover all calls for the D.C. Staff.  In a conference call at that time, Chief of Staff Anderson explained to Mr. Pope and the other District staffers that the D.C. staff had been sent home, with instructions not to tell anyone, including their families, roommates and friends, that they had been in close with individuals who had tested positive for COVID-19.  Anderson told the District Staff, similarly, not to disclose anything about the D.C. Office infections or that the D.C. Office had been closed due to COVID-19 exposure. Instead, Anderson instructed the District staff to forward calls and inquiries to the relevant staffers without providing any information to the callers.

Even though the District Director and the Communications Director (who worked from the District Office) were both in close contact with Representative Lamborn (who, in turn, had been in close contact with the infected D.C. employees), they were not allowed to work from home or to isolate, and instead they remained at work in the District Office, in close contact with all of the other staff in the District Office.

As the danger to Lamborn's staff became more concrete, and as more and more staffers began contracting COVID-19, Mr. Pope asserted his opposition to Lamborn's reckless practices and stood up for others in the office who were either at risk themselves or who had close family

who were at greater risk from the infection.  Representative Lamborn and his Chief of Staff, Dale Anderson, terminated Mr. Pope on December 7, 2020 because Plaintiff opposed their reckless approach to COVID-19 and their refusal to implement commonsense and reasonable protective measures in the workplace.

## I. JURISDICTION

1.  Plaintiff invokes the jurisdiction of this Court pursuant to the Congressional Accountability Act of 1995 (2 U.S.C. §1408 (a)), 28 U.S.C. § 1331 (Federal Question), and 28 U.S.C. § 1343.

2.  This is an action authorized and instituted pursuant to the Congressional Accountability Act (2 U.S.C. § 1301 et seq.).

3.  The unlawful employment practices alleged in this Complaint were committed in the District of Columbia.

4.  Plaintiff is a former employee of the House of Representatives, and, therefore, he is a "covered employee" pursuant to the Congressional Accountability Act (2 U.S.C. § 1301(a)(3)(A)).

5.  Plaintiff was employed by the Office of Representative Doug Lamborn as a Defense and Business Advisor in the Colorado Springs District Office.

6.  The Defendant is an "Employing Office" of the United States House of Representatives, pursuant to the Congressional Accountability Act (2 U.S.C. § 1301(a)(9)(A)).

7.  The Congressional Accountability Act requires Employing Offices, such as the Defendant, to "comply with the provisions of section 5 of the Occupational Safety and Health Act of 1970 (29 U.S.C. 654)." 2 U.S.C. § 1341(a)(1).

8.  29 U.S.C. § 654(a), in turn, mandates that each employer "furnish to each of his employees employment and a place of employment which are free from recognized hazards that

are causing or are likely to cause death or serious physical harm to his employees; [and to] comply with occupational safety and health standards promulgated under this Act."

9.   At all times relevant to this case, 29 U.S.C. § 654(a) required employers, including Defendant, to adopt reasonable protocols to limit the risk of COVID-19 infection and transmission in the workplace, including conducting hazard assessments to determine potential sources of infection to employees, encouraging the use of face masks, implementing measures to ensure safe distances (6 feet) between employees, permitting remote work, adding sanitizing stations and encouraging handwashing, requiring employees who have become infected with COVID-19 to isolate for a reasonable period of time until they are not likely to be contagious to others, and/or promptly notifying employees who have come into contact with co-workers who have been infected.

10. The Congressional Accountability Act makes it unlawful for an employing office, such as the Defendant, to "intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by [the] Act."

11. Plaintiff has satisfied all administrative and judicial prerequisites to the institution of this action. On May 12, 2021, the Plaintiff filed a claim with the Office of Congressional Workplace Rights raising the violations of the Congressional Accountability Act complained of here.  The Office of Congressional Workplace Rights (OCWR) Complaint was filed within 180 days from the date Defendant terminated Plaintiff, as required by 2 U.S.C. § 1402(d). Plaintiff has the right to file this civil action, pursuant to 2 U.S.C. §§ 1401 and 1408 because he has not submitted a request for a hearing with OCWR with respect to this claim (2 U.S.C. § 1401(b)(1)), and this civil action is filed within 70 days of the date Plaintiff filed his OCWR claim, as required

by 2 U.S.C. § 1401(d).

## II.  BACKGROUND FACTS

12. At all times relevant to this Complaint, Members and employees of the U.S. House of Representatives ("House") were educated about the requirements and prohibitions of the Congressional Accountability Act through Workplace Rights and Responsibilities Training and resources available through the Office of Congressional Workplace Rights.

13. House Rule XXIII sets forth the Code of Official Conduct for House Members and staff.  Rule XXIII, clause 1, requires that all Members and staff "behave at all times in a manner that shall reflect creditably on the House."  Rule XXIII's ethical mandate includes a prohibition against the violation of laws, which includes prohibiting Members and staff from violating the Congressional Accountability Act.

14. Congressman Lamborn has consistently disregarded ethical rules and norms that apply to Members of Congress. A few examples of the Representative's disregard for the rules demonstrate this recklessly self-serving approach to his position as a Member of Congress:

15. Representative Lamborn allowed his son to live in Congressional space.  Lamborn gave his son the necessary access to live in a storage area in the basement of the U.S. Capitol for a period of weeks when Lamborn's son relocated to Washington, D.C. for work.

16. Representative Lamborn used the personnel resources of his Congressional offices for the personal benefit of his family.  When Lamborn's son was applying to federal jobs, Lamborn's Office required Mr. Pope and another staffer to show him how the USA Jobs site worked and to give him tips on completing applications for federal employment. Subsequently, the Office required Mr. Pope to help prepare Lamborn's son for job interviews by asking him mock interview questions and helping him craft his responses.

17. The Office required staff to conduct personal errands for the Lamborn family, including:

    a.   Loading furniture to be moved to the Lamborn's vacation home;

    b.   Assisting Representative Lamborn's wife to set up a video telecom system so that she could hold personal video calls with her family;

    c.   Picking up personal mail at the Member's personal residence while the Member was out of town;

    d.   Couriering personal legal documents;

    e.   Picking up unofficial mail (to include donations) during official office hours;

    f.   Spending their lunch preparing mailers for the campaign;

18. Staff were also made to believe that accepting invitations for family events, including meals with the Lamborn family, was required in order to remain employed. Indeed, information that staff shared widely in the office was that one or two staffers had been terminated for declining such an invitation and that another staffer had been terminated for advising Representative Lamborn that the invitation had made the first staffer uncomfortable and that such invitations were inappropriate.

19. Staff were compelled to give Christmas and birthday gifts to Representative Lamborn and his wife.

20. Representative Lamborn allowed his wife to take the Office's supplies for her own personal use, including the Office's laminating machine and other office supplies.

21. Additionally, staff had to use official time to perform campaign work, including preparing campaign mailings, purchasing supplies and preparing for campaign events like the campaign party on primary night.

22. Representative Lamborn's disregard for rules and norms carried over into how he ran his D.C. and District Offices, in particular to how he responded to the COVID-19 pandemic, including his disregard for OSHA safety requirements and how he treated employees who wanted to comply with pandemic safety norms.

23. Representative Lamborn and The Office's conduct, including but not limited to its retaliation against Mr. Pope, as described in the following paragraphs, also violated House Rule XXIII.

### III.  FACTS PERTINENT TO RETALIATION CLAIM

24. Mr. Pope was commissioned as an Officer in the United States Marine Corps in March 2009, and he remained in active duty until July 2018. Mr. Pope rose to the level of Captain, the rank at which he retired from the service in 2018. During his service, between January and August 2014, Mr. Pope was deployed in a combat role to Helmand Provence, Afghanistan.

25. In August 2019, Mr. Pope was hired as a Wounded Warrior Fellow by Defendant to work in the District Office in Colorado.

26. In March 2020, Mr. Pope began suggesting COVID-19-related safety protocols and raising safety concerns, initially to the District Director, and later directly to Chief of Staff Dale Anderson.  Specifically, Mr. Pope stated that concerned employees should be allowed to telework and that social distancing measures should be implemented in the District Office.  Although the District Director took Mr. Pope's concerns seriously, Chief of Staff Anderson and Representative Lamborn did not, and the Office did not put reasonable precautions in place.  Although constituents were no longer allowed to enter the District Office itself, staffers were required to meet with constituents indoors, in either the hallway outside the office or in the building's atrium, and the Office did not enforce any mask requirement.

27. In the early months of the pandemic, March and April 2020, Mr. Pope learned from a colleague ("Female Colleague 1") that she was deeply concerned about COVID because she was in a high-risk category and her husband was immunocompromised.  Additionally, Mr. Pope learned from another colleague ("Male Colleague 1") that he had similar concerns for himself and his wife.  Mr. Pope was very vocal in raising safety concerns with the District Director on behalf of these two individuals, stating that they should be allowed to telework and also asking that social distancing be enforced.  In fact, Male Colleague 1 was required to share an office with Mr. Pope, and that office was not large enough for any social distancing.  Mr. Pope pointed out this problem to the Office, but to no avail.  Mr. Pope also regularly advocated for reduced staff occupancy in the District Office.

28. The District Director escalated Mr. Pope's concerns to Chief of Staff Anderson, who disregarded Mr. Pope's COVID-19 safety concerns.

29. Throughout the pandemic, Chief of Staff Anderson and Representative Lamborn often mocked safety protocols such as measures to distance employees from each other and the use of masks, and they minimized COVID-related concerns.  Chief of Staff Anderson and the Representative's wife, Mrs. Lamborn (who was a frequent visitor to the office and other events) also belittled any staffer who raised health-related concerns about the Office's response to the pandemic.

30. In the March and April 2020 timeframe, the District Office staff had meetings with Representative Lamborn and his wife, during which Representative Lamborn and Mrs. Lamborn both claimed that COVID was a hoax and asserted that the pandemic was being used to alter the course of the congressional and presidential elections.

31. As of approximately April 2020, Representative Lamborn was operating both the

8

District and D.C. Offices at maximum staff occupancy levels.  Unlike other offices, Representative Lamborn declared all of his employees to be "essential" and instructed them to ignore local and state shelter-in-place rules.

32. On May 1, 2020, Representative Lamborn hired Mr. Pope as a full-time employee to be his Defense and Business Advisor.

33. In the spring and early summer of 2020, Female Colleague 1 raised concerns with Chief of Staff Anderson, alerting him that, due to their underlying health conditions, she and her husband were immunocompromised and at higher risk of severe illness from COVID.  Chief of Staff Anderson dismissed and/or downplayed the coworker's concerns, telling her she was being overly dramatic; and he mocked her concerns, both in her presence and behind her back. Chief of Staff Anderson bullied and ridiculed Female Colleague 1 to such an extent that she ultimately stopped raising her concerns.

34. Mr. Pope recommended that the Office install a zip wall to limit Female Colleague 1's exposure to other people, which Chief of Staff Anderson and Representative Lamborn deemed excessive and denied.

35. In June and July 2020, Chief of Staff Anderson brought Mr. Pope to Washington, D.C. to be part of the National Defense Authorization Act. Consequently, Mr. Pope was in Washington, D.C. on the night of the June 30, 2020, Colorado primary elections.

36. All of the D.C. staffers, including interns, were strongly encouraged to attend a viewing party on the night of the primary election. The Lamborns rented a private house on Capitol Hill, where all the staff gathered without any social distancing measures in place and where the use of masks was not encouraged or required.

37. From June 30, 2020 forward, Representative Lamborn and Chief of Staff Anderson

took a hard line against allowing employees in the District Office to telework.

38. In August or September 2020 Female Colleague 1 had ultimately been permitted to telework for a short period of time as a result of an Americans with Disabilities Act accommodation request.  Notwithstanding, Lamborn called her back to work full time in the District Office.  At around the same time, all D.C. Office staff were instructed that they all had to be in the office when the House was in session and when Representative Lamborn was present. This instruction stood out for Mr. Pope because (1) it was a significant departure from House recommendations at the time, and (2) the District Office Staff had always been operating at full capacity, regardless of whether the House was in session or if Representative Lamborn was present and working from the District.

39. By October 2020, when it was abundantly clear that Representative Lamborn was willing to sacrifice the health and safety of his employees, Mr. Pope started being more vocal with Chief of Staff Anderson about his safety concerns in the face of the Office's absolute failure to take any reasonable precautions.  Among other things, Mr. Pope told Anderson that it was important to enforce social distancing guidelines, permit employees who were at risk to telework, require employees who were sick to isolate at home until they were no longer contagious and that other hygiene measures should be implemented.

40. At around this time, Chief of Staff Anderson would get angry and defensive when Mr. Pope raised his COVID-19 concerns, and Anderson would talk over him or shout Mr. Pope down.

41. In direct response to Mr. Pope raising his concerns, Chief of Staff Anderson developed an obvious and outward bias against Mr. Pope, and he argued with or belittled almost anything Mr. Pope did, for no valid reason.

42. As a result of Mr. Pope raising his concerns, Chief of Staff Anderson falsely told the

District Director that Mr. Pope was being belligerent or abrasive and had an attitude problem.  That was incorrect: Mr. Pope was not being belligerent, abrasive or disrespectful.  Instead, he matter-of-factly stated his position that the Office should be taking precautions to protect employees, including ensuring appropriate distancing and permitting employees to work from home.

43. In approximately October 2020, the House leadership pressured Representative Lamborn to limit his D.C. Office to 50% staffing.  In contrast, Lamborn kept his District Office fully staffed, because House leadership did not have the same ability to ensure that precautions were taken at the District Office.

44. On or about October 5, 2020, Representative Lamborn was visiting Colorado for an event.  In the car, Lamborn learned that his Deputy Chief of Staff had tested positive for COVID-19 and that additional D.C. staffers were symptomatic.  Upon learning this, the Congressman spoke to a physician within the Office of the Attending Physician (OAP), but the Congressman misrepresented the facts and falsely told the OAP that he had not been in close contact with his staff in D.C. over the previous several days.

45. Representative Lamborn's statements to the Office of the Attending Physician were untrue: The week in question had been a voting week, during which Representative Lamborn slept in his D.C. Office, and there had also been important meetings on various issues, including Space Force. Consequently, the Congressman was in close proximity to his staff that week.

46. Based on the inaccurate information that Representative Lamborn provided, the OAP physician told the Congressman that he did not need to take special precautions and did not need to be tested for the coronavirus unless he experienced symptoms.  Consequently, the Congressman continued to interact with staff.  To wit, Representative Lamborn attended a campaign event on the evening of October 6, 2020, and he did not postpone a previously scheduled trip to an important

military shipyard.

47. After Lamborn spoke to the OAP physician, one of Representative Lamborn's staff said that he was going to put his mask on.  The Congressman responded: "Well, I don't care about you guys getting it."  Mrs. Lamborn said she refused to put on a mask because "no one was going to tell [her] what to do."

48. Plaintiff was very concerned that Representative Lamborn's reckless behavior could expose the staff, community, and valuable national defense assets to illness and harm; and he expressed those concerns to the District Director.

49. On October 5 or 6, 2020, after several employees of the D.C. office tested positive for COVID-19, Representative Lamborn closed the D.C. Office temporarily and instructed all D.C. employees to work from home.

50. In a conference call on or about October 6, 2020, Chief of Staff Anderson explained to Mr. Pope and the other District staffers that the D.C. staff had been sent home, with instructions not to tell anyone, including their families, roommates and friends, that they had been in close contact with infected individuals and were potentially carrying COVID-19.

51. Chief of Staff Anderson told the District Office Staff, similarly, not to disclose anything to anyone outside the Office about the D.C. Office infections or that the D.C. Office had been closed due to COVID-19 exposure. Instead, Anderson instructed the District Office staff to forward calls and inquiries to the relevant staffers without providing any information to the callers. Mr. Pope strongly objected to the Chief of Staff's instructions on the October 6 conference call, but the Chief of Staff disregarded him.

52. On October 9, 2020, a top-level employee in the District Office received a positive COVID-19 test after symptoms had begun on October 6, 2020, which was immediately after the

staffer had been in close proximity to Representative Lamborn and his wife.

53. The Congressman was not concerned about the employee's COVID-19 illness or its potential consequences for the employee. Rather, Representative Lamborn told this employee that his absence from work (awaiting test results and subsequently, recovering from COVID) was holding up Lamborn's itinerary and his travel plans.

54. Following October 9, 2020, Representative Lamborn and Chief of Staff Anderson insisted that the District Office be fully staffed. As a result, Mr. Pope was even more vocal, expressing safety concerns with Chief of Staff Anderson, particularly due to the disparity between the safety protocols in the D.C. Office and the District Office.

55. On November 18, 2020, shortly after an important meeting for Space Force that Mr. Pope had organized, which Representative Lamborn had attended, Mr. Pope learned that Lamborn and two additional staffers (who had also participated in the Space Force planning meeting) had tested positive for COVID-19. Mr. Pope first learned about these infections from third parties, not Representative Lamborn or any other employee of his office.

56. On November 19, 2020, Mr. Pope tested positive for COVID-19, and he contends that Representative Lamborn was the direct or indirect cause of his infection.

57. On or about November 19, 2020, in light of the number of COVID-19 cases in the Office, Chief of Staff Anderson and Representative Lamborn directed the District Office to convert to 100% telework until after Thanksgiving. Notwithstanding the high incidence of COVID-19 infections, the Office did not allow 100% telework for a more prolonged period.

58. During approximately the first week of December 2020, Chief of Staff Anderson and Representative Lamborn decided to terminate Mr. Pope for his vocal opposition to Lamborn's reckless approach to COVID-19.

59. On December 7, 2020, Chief of Staff Anderson called Mr. Pope from Washington, D.C., and told Mr. Pope that the decision had been made with Representative Lamborn's approval to terminate him because of an alleged lack of professionalism and abrasiveness toward his colleagues and supervisors.

60. Chief of Staff Anderson had previously used terms like "lack of professionalism" and "abrasive" to refer to instances in which Mr. Pope had stated his concerns about Representative Lamborn and the Chief of Staff's reckless response to the COVID-19 pandemic.

61. Mr. Pope was terminated as of 6:00pm Central Time on December 7, 2020.

62. The true reason that Chief of Staff Anderson and Representative Lamborn terminated Mr. Pope was that Mr. Pope had vocally opposed Lamborn's reckless refusal to adopt any reasonable safety protocols in the District Office, and placed employees and others at significant risk of serious illness or death as a result of COVID-19 infection.

## IV. COUNT I – RETALIATION

63. Plaintiff restates and incorporates by reference each of the above paragraphs as if it were specifically repeated here.

64. Defendant's failure to adopt any reasonable protections for employees, including social distancing, permitting at-risk employees liberal work-from-home privileges, requiring (or even encouraging) employees to wear masks, requiring employees (including Representative Lamborn himself) to isolate after being in close contact with others who had tested positive for COVID-19, and reasonably notifying employees about their close contact with co-workers (including Representative Lamborn) who had been infected, violated the Congressional Accountability Act (2 U.S.C. § 1341(a)(1)), which requires Employing Offices to "comply with the provisions of section 5 of the Occupational Safety and Health Act of 1970 (29 U.S.C. § 654)."  Title 29 U.S.

Code § 654 (a), the provision of the Occupational Safety and Health Act incorporated into the Congressional Accountability Act, in turn, mandates that each employer "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees; [and to] comply with occupational safety and health standards promulgated under this Act."

65. The Congressional Accountability Act (2 U.S.C. § 1317) makes it "unlawful for an employing office to intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by [the Congressional Accountability] Act."

66. Mr. Pope engaged in protected activity under the Congressional Accountability Act because he opposed Defendant's unlawful practices, namely by repeatedly voicing his concerns and complaining about the Defendant's failure to adopt reasonable workplace protections to control and limit the spread of COVID 19. Defendant's unlawful practices created hazardous conditions involving the serious risk of physical harm and death.

67. Defendant took reprisal against Plaintiff, in violation of the Congressional Accountability Act (2 U.S.C. § 1317(a)), when it terminated him on December 7, 2020, because of his protected activity referenced in the paragraphs above.

68. As a result of Defendant's unlawful conduct, Plaintiff has suffered substantial economic damages, in the form of the lost income from his position.

69. As a result of Defendant's unlawful conduct, Plaintiff has suffered emotional pain and suffering, fear, embarrassment, humiliation, inconvenience and feelings of depression and feelings of anxiety.

WHEREFORE, Plaintiff prays that this Court: (i) declare that the employment practices

complained of in this Complaint are unlawful in that they violate the Congressional Accountability Act; (ii) permanently enjoin Defendant and its agents, officers and employees from engaging in all practices found by this Court to be in violation of the Congressional Accountability Act; (iii) order Defendant to make Plaintiff whole by paying Plaintiff any monetary damages proved at trial in addition to compensatory damages for the Plaintiff's emotional pain and suffering and any out of pocket expenses, in an amount to be determined at trial; (iv) retain jurisdiction over this action to ensure full compliance with the Court's orders and require Defendant to file such reports as the Court deems necessary to evaluate such compliance; (v) order Defendant to pay Plaintiff's costs and expenses and reasonable attorneys' fees in connection with this action; and (vi) grant such other and further relief to Plaintiff as the Court deems just and proper.

### PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully Submitted,
ALDERMAN, DEVORSETZ & HORA, PLLC


Leslie D. Alderman III (D.C. # 477750)
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036
Tel: 202-969-8220
Direct: 202-652-2451
lalderman@adhlawfirm.com

Attorney for the Plaintiff